■ Luisa Hamer, Appellant-Respondent, v City of New York, Defendant, and New York City Department of Education, Also Known as New York City Board of Education, Respondent-Appellant. [965 NYS2d 99]—

Judgment, Supreme Court, New York County (Lottie E. Wilkins, J.), entered March 5, 2012, after a jury trial, awarding

plaintiff damages for pain and suffering, upon a verdict apportioning liability 75% to plaintiff and 25% to defendant Department of Education (DOE), unanimously reversed, on the law, and the matter remanded for a new trial on both liability and damages, without costs.

On January 30, 2007, plaintiff, then 60 years old, broke her left femur when she tripped and fell on a raised piece of concrete on the sidewalk abutting premises occupied by Public School 128. In the months prior to the accident a custodian at the school, whose duties included inspecting the sidewalk for defects and tripping hazards, had twice submitted work requests to the DOE's Division of School Facilities with respect to that portion of the sidewalk, which he considered such a hazard.

Dr. Jeffrey Geller performed surgery on plaintiff on the day of the accident, having diagnosed her with a supracondylar femur fracture on the left leg, the area of the thigh directly above the knee. The X ray revealed that it was an "intra-articular" break, with multiple fracture lines, which went across the femur and into the joint, resulting in friction which could lead to arthritis. One day after the accident, Dr. Geller performed an open reduction, with internal fixation, repairing the fracture by realigning the broken bones and inserting a plate and screws.

Five days after the accident, plaintiff was able to walk around the hospital with a walker, accompanied by a physical therapist. She remained in the hospital for two weeks after surgery. Upon discharge, Dr. Geller instructed plaintiff, among other things, not to put excess weight on her leg, as she was at a high risk of falling or reinjuring herself. After discharge, plaintiff received two months of home-care services, where she ambulated with a walker and learned to use crutches for the stairs. She later received therapy at the hospital. By May 2007, plaintiff was treating her pain with Tylenol and medicated patches. She continued to use a walker, but only at home, and used crutches only to negotiate the stairs in her building.

After her discharge, Dr. Geller next saw plaintiff on March 19, 2007. At that time, plaintiff was using a walker and was partially weight-bearing. Dr. Geller noted that the surgical incision had healed well, that plaintiff had limited range of motion in her knee but no knee instability, that the knee was moving and tracking well, and that plaintiff had no pain. While plaintiff did not return for a scheduled appointment in May 2007, Dr. Geller noted that "[b]y her report however, she is doing well." Dr. Geller later testified at trial that for a typical person with the type of injury suffered by plaintiff it takes a year to recover muscle strength and two and three months for the bones to

heal, but that the broken bone never really takes on its normal shape. In addition, scar tissue forms during the healing process, leading to stiffness and swelling. He further testified that plaintiff's fall caused her left leg fracture, that plaintiff would always have limited range of motion in her knee and some degree of scar tissue in the surrounding muscle, and would likely develop arthritis due to the intra-articular nature of the fracture. Dr. Geller also stated that the arthritis would be painful and was generally treated with a knee replacement. In August 2007, plaintiff was visiting a house in the Poconos when she felt weakness in her left leg while walking and fell. She was driven back to New York, where Dr. Geller diagnosed her with a new, transverse fracture in the middle of her left femur, near the top of the implant, where the uppermost screw had been placed. Dr. Geller repaired the fracture by inserting additional hardware into the leg. Plaintiff stayed in the hospital on the orthopedic floor for eight days and was then transferred to the rehabilitation floor for nine days. After her discharge from the second surgery, plaintiff used a walker for three or four months, and then used a cane.

Plaintiff next saw Dr. Geller on October 15, 2007, at which time, as he noted in a report, she was "feeling great with basically no pain," had "great range of motion," her incision was well healed, and she could advance to weight-bearing, as tolerated. However, he testified at trial that at the time she was taking Percocet for pain and limping badly. Dr. Geller prescribed physical therapy and encouraged plaintiff to advance from using a walker to a cane. Plaintiff did not return for her next appointment and Dr. Geller never saw her again.

In 2009, plaintiff stopped walking with a cane and, in July 2009, she stopped attending physical therapy. Her leg continues to bother her periodically, preventing her from going outside without assistance and from walking more than two blocks without needing to stop. Her leg pain also prevents her from doing many of the things she did before the accident, such as attending church, visiting her grandchildren and taking them to school, and shopping for groceries.

Several evidentiary disputes arose during trial. One led to a ruling refusing to allow Dr. Geller to opine as to the cause of the second fracture or whether it was related to the initial injury. In doing so, the court noted that, while plaintiff's supplemental verified bill of particulars gave notice of "impaired gait causing post-surgical fall resulting in fracture of the . . . femoral shaft," Dr. Geller's report, furnished pursuant to CPLR 3101 (d), had not indicated that he would opine as to the causal

relationship between the first and second surgery. At the close of evidence, the court granted the DOE's motion to strike all testimony given regarding plaintiff's second injury and second surgery.

Another dispute arose regarding plaintiff's testimony. Plaintiff testified through a Spanish interpreter. Through the interpreter, plaintiff testified that she fell "[o]n the sidewalk by the curb," after her foot got caught on a raised, cracked piece of concrete, near the school's cafeteria. She later clarified that the area of her fall was "not near the curb" and then stated that it was "close to the curb." During cross-examination, plaintiff's counsel, outside the presence of the jury, alerted the court that he had a "tricky issue with translation." He explained "I've spoken to the plaintiff about [it] and I just spoke with her son. My understanding is she is saying the [Spanish] word acera for curb, which to her means sidewalk. I think she's been saying sidewalk." The interpreter then explained that "acera means anywhere from the edge of a building until where the curb begins in the street" and that the word "curb" is "translated as ditch, canaleta, ditch. It's not really a curb per se." The interpreter further stated that "I don't know if [plaintiff] understands the difference" between the curb and sidewalk. When the DOE's counsel asked the interpreter if, when he used the word "curb," he interpreted that word for plaintiff, the interpreter answered "I said to her sidewalk, which means the entire edge, the entire surface." He also stated that he translated the word "curb" as "acera."

Plaintiff's counsel then sought permission to ask plaintiff questions intended to clarify what she meant when she testified regarding where she fell. The court denied the request, ruling that plaintiff was "very emphatic" when she said had not fallen close to the curb, and that, in any event, she was clear about where she fell when shown pictures of the accident site. Nevertheless, during the DOE's summation, its counsel referred to plaintiff's statements that she fell near the curb as one of "eight inconsistencies, eight differences, eight things that say she didn't fall where she said she fell."

Finally, plaintiff sought a missing witness charge with respect to a physician, Dr. Westerbrand, whom the DOE had designated as a medical expert but did not call to testify at trial. The DOE opposed the request, contending that Dr. Westerbrand was out of state and not under its control. However, it offered no support that such was the case. Nevertheless, the court declined to give the charge, noting that only the initial injury was at issue at trial, and that the nature of that injury was undisputed.

At the close of evidence, defendant City moved to dismiss the complaint on the grounds that the City had no prior written notice of the defect which caused plaintiff's fall. The DOE moved to dismiss on the basis that it was not the owner of the property where the accident occurred. The court granted the City's motion, and denied the DOE's.

The jury rendered a verdict finding that, while the DOE's negligence in maintaining the sidewalk adjacent to its property was a substantial cause of plaintiff's injury, plaintiff's negligence was also a substantial cause. The jury apportioned 25% of the liability to the DOE and 75% of the liability to plaintiff. The jury awarded plaintiff $40,000 for past pain and suffering and $15,000 for future pain and suffering for one year. Plaintiff moved to set aside the verdict as against the weight of the evidence, seeking additur. The court denied the motion, finding that the jury could have reasonably concluded that the lasting effects of the initial injury were relatively minor.

The DOE argues on appeal that the action should have been dismissed as against it because it did not own the sidewalk where plaintiff fell. New York City Charter § 521 (a) provides that "title to all property . . . acquired for school or educational purpose . . . shall be vested in the city, but under the care and control of the board of education for the purposes of public education, recreation and other public uses." Education Law § 2554 (4) affirmatively charges the DOE with responsibility for "the care, custody, control and safekeeping of all school property or other property of the city used for educational, social or recreational work." The DOE contends that these provisions are inapplicable to this case because the sidewalk on which plaintiff fell is not used for educational purposes, so it had no duty to maintain it. However, it cites no authority to support its position that the DOE's duty does not extend outside the school walls.

There is no statute or regulation which squarely designates the DOE as responsible for maintaining public areas outside school buildings. However, it is uncontested that the custodian of the school adjacent to the sidewalk where plaintiff slipped considered it his responsibility to search for defects in the sidewalk and to submit requests directly to the DOE to have them repaired. Under those circumstances, where there was evidence that the DOE affirmatively undertook the duty to maintain the sidewalk, the court was well within its discretion in submitting the question of the DOE's negligence to the jury (*see Mudgett v Long Is. R.R.*, 81 AD3d 612, 613 [2d Dept 2011]).

As to plaintiff's request for a new trial on damages, we first

address the court's preclusion of testimony from Dr. Geller concerning plaintiff's second accident and its consequences. CPLR 3101 (d) (1) (i) provides that, upon request, parties must identify those expected to be called as experts and "disclose in reasonable detail the subject matter on which each expert is expected to testify, the substance of the facts and opinions on which each expert is expected to testify . . . and a summary of the grounds for each expert's opinion." However, the failure to serve a CPLR 3101 (d) notice with regard to a *treating* physician, such as Dr. Geller, is not grounds for preclusion of the physician's expert testimony as to causation where there has been disclosure of the physician's records and reports, pursuant to CPLR 3121 and 22 NYCRR 202.17 (*see Breen v Laric Entertainment Corp.*, 2 AD3d 298 [1st Dept 2003]; *Ryan v City of New York*, 269 AD2d 170 [1st Dept 2000]). As this Court observed in *Breen*: "Where . . . a plaintiff's intended expert medical witness is a treating physician whose records and reports have been fully disclosed . . . , a failure to serve a CPLR 3101 (d) notice regarding that doctor does not warrant preclusion of that expert's testimony on causation, since the defendant has sufficient notice of the proposed testimony to negate any claim of surprise or prejudice" (2 AD3d at 299-300). We have further held that a treating physician "[can] testify as to the cause of the injuries even though he expressed no opinion as to causation in the previously exchanged report" (*Finger v Brande*, 306 AD2d 104, 104 [1st Dept 2003]).

The DOE is correct that Dr. Geller's records and reports do not causally relate plaintiff's first and second fractures. Indeed, while Dr. Geller's February 3, 2009 narrative report discussed plaintiff's initial and subsequent fractures, it did not, in any way, attribute the second fracture to the first one. Likewise, the operative report for the second surgery did not causally relate the two injuries. Nevertheless, the supplemental bill of particulars, to the extent it alleged "impaired gait causing post-surgical fall resulting in fracture of the . . . femoral shaft," indicated a causal link between the two fractures sufficient to place the DOE on notice of plaintiff's theory. The DOE's argument that Dr. Geller's testimony failed to connect the second fall to the initial injury is disingenuous because, of course, he was precluded from giving such testimony.

Since the DOE failed to establish the critical element of surprise, the court improvidently exercised its discretion in precluding Dr. Geller from testifying as to the second injury. Further, there is a reasonable likelihood that the jury's inability to consider the second injury, which was very serious and required surgery, had an effect on the damages award.

Plaintiff further argues that the court committed reversible error in refusing to issue a missing witness charge with respect to Dr. Westerbrand, the defense expert. "A missing witness charge should be granted when the opposing party has shown that the uncalled witness is knowledgeable about a material issue upon which evidence is already in the case, that the witness would naturally be expected to provide noncumulative testimony favorable to the party who has not called the witness and that the witness is available to that party" (*Germe v City of New York*, 211 AD2d 480, 480 [1st Dept 1995]).

Here, plaintiff satisfied each of these elements. First, the DOE failed to offer support that Dr. Westerbrand was unavailable. Second, clearly the doctor was knowledgeable about plaintiff's physical condition. Finally, his testimony would have been noncumulative, and would naturally have been expected to favor the DOE, which, after all, designated him as its medical expert. That Dr. Westerbrand's report in fact noted that, upon his examination of plaintiff, there were abnormal ranges of motion in her leg, only bolsters plaintiff's contention that the charge was appropriate. Further, the fact that Dr. Westerbrand conducted his examination after the second surgery is irrelevant, because the DOE can only speculate in arguing that any testimony he had to offer would not have been probative as to the first injury.

Plaintiff contends that a new damages trial is necessary not only because of these evidentiary errors, but also because the total award of $55,000 for past and future pain and suffering is inadequate and deviates materially from reasonable compensation. Dr. Geller's and plaintiff's unrefuted testimony established that, as a result of the accident, plaintiff fractured her left femur, which required open reduction and internal fixation, with a two-week-long hospital stay, followed by a course of physical therapy. Plaintiff's injury required her to use a walker and then a cane to ambulate for some time and resulted in the restriction of her activities of daily living.

Given the injury and its sequella, the jury's pain and suffering awards deviate materially from reasonable compensation. By way of comparison, in *Alfonso v Metropolitan Tr. Auth.* (103 AD3d 563 [1st Dept 2013]), an award of $450,000 for past pain and suffering and $800,000 for future pain and suffering was considered appropriate where a 52-year-old plaintiff fractured her wrist, requiring open reduction and internal fixation, and suffered reduced ranges of motion and a likelihood of progressive arthritis. Other reported decisions similarly suggest that the jury award was incongruent with what would have reason-

ably been expected for the injury suffered by plaintiff (*see Lowenstein v Normandy Group, LLC*, 51 AD3d 517 [1st Dept 2008] [$300,000 award for past pain and suffering and $850,000 award for future pain and suffering sustained where the plaintiff, in her 60s, suffered a fractured ankle, which was treated with open reduction and internal fixation, and a shoulder fracture]; *Ruiz v New York City Tr. Auth.*, 44 AD3d 331 [1st Dept 2007] [$100,000 for past pain and suffering and $200,000 for future pain and suffering where 46-year-old plaintiff underwent surgery for a fractured right ankle, involving open reduction and internal fixation with a plate and screws]).

Finally, plaintiff seeks a new trial on liability on the basis of the confusion surrounding the use and translation of the Spanish word "acera." She argues that the jury was left with an impression that she was unsure of where she fell, and consequently found the DOE only 25% liable for the accident. Indeed, in its summation, the DOE focused on certain perceived inconsistencies in plaintiff's testimony. It is not unreasonable to assume that the jury, as urged by the DOE's counsel, questioned plaintiff's credibility in part based on her testimony, as translated by the interpreter, that she fell near the curb, when at other times she maintained that she fell on the sidewalk. Indeed, based on this record, it is difficult to imagine another reason for a finding that plaintiff was 75% culpable for this trip-and-fall accident. A review of the transcript, particularly the extensive colloquy over whether the interpreter's use of the word "acera" misconstrued what counsel meant when they used the words "curb" and "sidewalk," and whether his use of the words "sidewalk" and "curb" misconstrued what plaintiff meant when she used the word "acera," reveals that there was, at the very least, palpable confusion concerning the word. Had the court permitted plaintiff's counsel, in light of the confusion, to ask plaintiff questions intended to ensure that the jury heard an accurate description of where plaintiff fell, such credibility concerns may well have been eliminated. Under the circumstances, the court's simply pointing out plaintiff's testimony that she fell on the "sidewalk" was insufficient to rectify the error in translation, since the jury may have still been left with the impression that plaintiff was confused (*see People v Kowlessar*, 82 AD3d 417, 418 [1st Dept 2011]). Concur—Mazzarelli, J.P., Acosta, Freedman, Richter and Gische, JJ.